(May 3, 2011)

■ E-Z Eating 41 Corp., Appellant, and E-Z Eating 47 Corp., Intervenor-Appellant, v H.E. Newport L.L.C. et al., Respondents. [922 NYS2d 329]—

Appeals from orders, Supreme Court, New York County (Carol R. Edmead, J.), entered March 27, 2009, which, inter alia, denied plaintiff tenant's and intervenor subtenant's motions for *Yellowstone* injunctions and dismissed their complaints for declaration of their rights under a lease and sublease, dismissed as moot, without costs, and the orders vacated.

Given that the time to cure the alleged lease default has expired, and that the E-Z Eating 41 Corp. has surrendered possession of the premises, the orders appealed are presently moot (*see Matter of Johnson v Pataki*, 91 NY2d 214, 222 [1997]; *cf. Automated Ticket Sys. v Quinn*, 90 AD2d 738, 739 [1982] [dismissing claims for declaratory relief relating to contract; "(t)he contract having expired, all of the rights asserted by plaintiff against defendants have accrued, and plaintiff should seek its remedy in an action at law for damages" (internal quotation marks omitted)]). In addition, there is no indication that the appeal should be excepted from the mootness doctrine (*see Matter of Hearst Corp. v Clyne*, 50 NY2d 707, 714-715 [1980]).

While the general rule in New York is to simply dismiss an appeal which has been rendered moot, vacatur of an order or judgment on appeal has, in circumstances such as those presented here, been held to be an appropriate exercise of discre-

tion where necessary " 'in order to prevent a judgment which is unreviewable for mootness from spawning any legal consequences or precedent' " (see *Funderburke v New York State Dept. of Civ. Serv.*, 49 AD3d 809, 811 [2008], quoting *Matter of Hearst Corp. v Clyne*, 50 NY2d at 718).

Our vacatur is without prejudice to the parties seeking any further relief they deem appropriate. Concur—Gonzalez, P.J., Friedman, DeGrasse and Manzanet-Daniels, JJ.

McGuire, J., dissents in a memorandum as follows: I disagree with the majority on an issue about which reasonable minds can differ: whether these appeals and the underlying actions are moot. Because I conclude the appeals and the underlying actions are not moot, I reach the merits and would reverse.

In July of 1997, plaintiff-appellant E-Z Eating 41 Corp. (E-Z Eating) entered into a 20-year lease with an entity that is not a party to this action to operate a Burger King restaurant on certain premises at 485 Fifth Avenue in Manhattan. Nonetheless, subparagraph (a) of paragraph 41, entitled "Use and Occupancy," of a "Rider" to the lease states that "[t]enant shall operate its business in the Demised Premises during the term and occupy the Demised Premises solely as a restaurant with table-seating operated under the name and style of 'Burger King' for on and off site consumption of food and beverage and for no other purpose." On the other hand, subparagraph (b) of the same paragraph states that "[t]enant shall use, occupy, operate and maintain the Demised Premises through the Term as a restaurant with table-seating for on and off site consumption in a reputable manner and in a manner which shall not detract from the character, appearance or dignity of the Building." Although these two subparagraphs share a common parent in paragraph 41, the relationship between these siblings is at best strained. That relationship and certain provisions of the lease relating to assignment and subletting are at the heart of the parties' dispute.

In July of 2008, a federal district court in Florida granted permanent injunctive relief to Burger King in an action between it and, inter alia, E-Z Eating, its affiliate, E-Z Eating 47 Corp. (E-Z 47), and Elizabeth and L. Luan Sadik, the principals of both entities, each of whom owns 50% of each corporation's shares. The injunction bars E-Z Eating, E-Z 47 and the Sadiks from operating a Burger King restaurant. In addition, the court granted summary judgment to Burger King, declaring, inter alia, that Burger King's termination of franchise agreements between it and E-Z Eating and E-Z 47 had been proper.

E-Z Eating commenced this action for declaratory and injunctive relief on September 11, 2008,[1] asserting in its complaint that counsel for the owners of the building in which the premises are located, the successors-in-interest to the original landlord, defendants H.E. Newport L.L.C., HTS-NYC LLC and Hyatt Hotels Corporation (the owners), had taken the erroneous position that, absent the owners' consent, the lease did not permit E-Z Eating to use the premises for any purpose other than a Burger King. E-Z Eating seeks a declaration that it is permitted to use the premises for a fast food burger restaurant in the style and manner of a Burger King and an injunction barring the owners from requiring E-Z Eating to seek their consent to use the premises for the purpose of operating such a restaurant.

Shortly thereafter, the owners served E-Z Eating with a 15-day notice to cure in which they contended that E-Z Eating was in breach of the lease because subparagraph (a) of paragraph 41 requires it to operate its business in the premises solely as a Burger King restaurant. By order to show cause dated October 16, 2008, E-Z Eating sought both a *Yellowstone* injunction tolling the running of the notice to cure and an injunction restraining the owners from taking steps to terminate its tenancy and from commencing any action to recover possession of the premises. The next day, Supreme Court granted the requested relief in the form of a temporary restraining order, thereby tolling the running of the notice to cure, which otherwise would have expired on October 22, 2008. Meanwhile, E-Z Eating and E-Z 47 entered into a sublease, dated as of October 1, 2008, of the premises. On October 30, 2008, Supreme Court granted, on consent, E-Z 47's motion to intervene. In its intervenor complaint, E-Z 47 alleges that: the lease permits E-Z Eating, without the consent of the owners, "to sublet the entire premises . . . for the continued use of the entire premises for restaurant purposes with table-seating for on and off site consumption and for no other purpose to an affiliate, as defined in the lease, or to a subsidiary"; it is such an affiliate and is not required by the lease to operate a Burger King restaurant on the premises; and any default under the lease by E-Z Eating had been cured. Accordingly, E-Z 47 seeks a judgment declaring, inter alia, that: the lease is in force and effect; any default under the lease has been cured; it is permitted by the lease to operate such a restaurant on the premises and is not required to oper-

---

1. Although the complaint also seeks attorney's fees, E-Z Eating does not press this claim on appeal or even assert that it saves the complaint from mootness.

ate a Burger King; and the sublease is effective and binding on the owners.

By an order dated March 24, 2009 and a decision and order dated March 25, 2009, Supreme Court denied E-Z Eating's motion for *Yellowstone* relief and for an injunction restraining the owners from taking steps to terminate its tenancy and from bringing any action to recover possession of the premises. In Supreme Court's view, the lease unambiguously "precludes the use of the premises by either [t]enant or its subtenant, for any purpose, other than 'as a restaurant with table-seating operated under the name and style of "Burger King" for on and off site consumption of food and beverage.' " Although Supreme Court acknowledged that the lease permitted E-Z Eating to assign or sublet the lease to an affiliate without the consent of the landlord, the court ruled that such an assignee or sublessee is required, absent the consent of the landlord, to operate a Burger King restaurant. For these reasons, and because it was undisputed that E-Z Eating and E-Z 47 were barred by the federal injunction from operating a Burger King, Supreme Court denied the motion. Although the owners had not cross-moved for any relief, Supreme Court nonetheless dismissed both complaints.

On March 27, 2009, the owners served a five-day notice of cancellation of the lease on E-Z Eating. Both E-Z Eating and E-Z 47 promptly moved in this Court for injunctive relief pending their separate appeals from the two March orders of Supreme Court. Specifically, each sought an order tolling the notice of cancellation and enjoining the owners from interfering with their possession and use of the premises. A Justice of this Court granted an interim stay on April 2, 2009, but a panel of this Court denied their respective motions on May 14, 2009 (*see* 2009 NY Slip Op 72471[U]; 2009 NY Slip Op 72472[U] [1st Dept 2009]).

By a letter dated August 31, 2009, counsel for the owners advised this Court of a decision in a summary holdover proceeding it had commenced against E-Z Eating and E-Z 47 in Civil Court. According to the decision, dated August 20, 2009, the owners commenced the proceeding on June 12, 2009. The decision recites statements by E-Z Eating and E-Z 47 that once this Court denied their motions for an order, inter alia, tolling the expiration of the notice of cancellation, the owners regained possession of the premises. For this reason, Civil Court granted the motion of E-Z Eating to dismiss the owners' petition, reasoning that the proceeding was pointless because "the landlord already ha[d] full legal possession of the premises." In his letter,

counsel for the owners did not assert that the appeals or the underlying action were moot. Nor did the owners move to dismiss the appeals thereafter, during the period of almost three months that elapsed between Civil Court's decision and oral argument of the appeals before this Court.

# I

The question of mootness was not raised until oral argument. We all agree, and E-Z Eating and E-Z 47 did not contend otherwise at oral argument, that the claims for injunctive and declaratory relief are moot because neither E-Z Eating nor E-Z 47 is in possession of the premises. For this reason, counsel for the owners took the position that the appeals were moot. Counsel for E-Z Eating and E-Z 47, however, took the position that the appeals were not moot because they could recover damages from the owners for wrongful termination of the lease.

In retrospect, we should have requested supplemental briefing from the parties on the question of whether the claim for money damages first raised at oral argument saves the appeals (and the underlying action) from dismissal on mootness grounds. We have left ourselves to puzzle out the answer on our own, and the majority not unreasonably concludes that the answer is no. Although my less than exhaustive research has not yielded any New York precedents on point, several federal decisions are and they lead me to the opposite conclusion.

In Z *Channel Ltd. Partnership v Home Box Office* (931 F2d 1338 [9th Cir 1991], *cert denied* 502 US 1033 [1992]), Z Channel abandoned count two of its complaint after discovery, leaving only a claim in count one for declaratory and injunctive relief. HBO sought summary judgment on count one and the district court granted it. After Z Channel filed its appeal, its new owners made a business decision that rendered moot its claims for injunctive and declaratory relief (*id.* at 1340). The panel began its analysis by noting that on the basis of precedent and rule 54 (c) of the Federal Rules of Civil Procedure, "[i]t is clear that Z Channel did not foreclose relief in damages by failing to ask for them in its Count One prayer" (*id.* at 1341).[2] The panel distinguished its decision in *Dan Caputo Co. v Russian River County Sanitation Dist.* (749 F2d 571 [9th Cir 1984]), on

---

**2.** Rule 54 (c) provides that "[e]very . . . final judgment should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings." CPLR 3017 (a) is to the same effect. With an exception not relevant here, it provides that "the court may grant any type of relief within its jurisdiction appropriate to the proof whether or not demanded, imposing such terms as may be just."

the ground that "[i]n *Caputo* there was no indication that damages were sought even as late as appeal, or that damages would have been appropriate" (931 F2d at 1341). The panel held that "the damages remedy is sufficiently before us to preclude a dismissal for mootness" because Z Channel raised a claim for damages on appeal and count one "construed favorably to it, alleges restraints that could have resulted in financial damage to Z Channel" (*id.*).

*Chicago United Indus., Ltd. v City of Chicago* (445 F3d 940 [7th Cir 2006]) also is on point. After one of its contractors commenced an action against it seeking injunctive relief, the City took certain actions that rendered the claim for injunctive relief moot (*id.* at 946-948). Writing for a unanimous panel of the Seventh Circuit, Judge Posner held that the contractor's "claim" for lost profits, although "made only in its brief and oral argument in this court," "saved [the suit] from complete mootness, though only barely" (*id.* at 948). And despite the briefness of the period in which the contractor might have lost profits, the panel regarded it as sufficient that "it is at least plausible that [it] lost profits" (*id.*). As did the Ninth Circuit panel in *Z Channel*, the court relied in part on the sweeping terms of rule 54 (c) (*id.*). Moreover, the panel was undeterred by the City's argument, "with considerable force[,] that [the contractor] deliberately withheld its damages claim lest such a claim weaken its case for preliminary relief by indicating that it had incurred no irreparable harm" (*id.*). Distinguishing cases coming to the opposite conclusion, Judge Posner wrote that "[t]his case is different because the litigation had barely begun before it came to us; had there been no appeal, [the contractor] would doubtless have asked for damages before the litigation had proceeded far" (*id.*).

This case is a fortiori to *Z Channel* and *Chicago United*. As noted, rule 54 (c) and CPLR 3017 (a) are substantively identical. E-Z Eating and E-Z 47 made clear at oral argument that as a result of the owners' termination of the lease, they are seeking money damages. And it certainly is more than plausible that they can recover money damages if, construing their allegations favorably to them, the owners wrongfully insisted both that E-Z Eating was required to operate only a Burger King and that without their consent E-Z 47 could not as an assignee operate any restaurant other than a Burger King. Here, as in *Chicago United*, the case had barely begun before it came to us. Indeed, not only has no discovery been taken, no answer was filed and no dispositive motion ever was made by the owners. Supreme Court's sua sponte dis-

missal of E-Z Eating's and E-Z 47's complaints prevented E-Z Eating and E-Z 47 from amending their complaints to seek damages, amendments they otherwise could have made as of right. Moreover, there is no reason to think that E-Z Eating and E-Z 47 withheld a claim for damages for tactical reasons. To the contrary, they may well not have sustained any cognizable damages before the complaints were dismissed. After all, it was not until after the complaints were dismissed that the owners were able to cancel the lease and E-Z Eating and E-Z 47 vacated the premises. Nor should we look askance at the claim for damages because it was raised for the first time at oral argument rather than in the main or reply briefs of E-Z Eating and E-Z 47. We have no reason on this record to conclude that they had vacated the premises prior to the dates, July 9 and 10, 2009, they filed their main briefs. And as the owners never raised the question of mootness in their respondents' brief, we should not fault E-Z Eating and E-Z 47 for not addressing the subject in their reply briefs.

Finally, to the extent that judicial economy considerations are relevant (see *Thomas R.W., By & Through Pamela R. v Massachusetts Dept. of Educ.*, 130 F3d 477, 479 [1st Cir 1997] ["rationale for the mootness doctrine is predicated on judicial economy—saving the use of the court's scarce resources for the resolution of real disputes"]), they support the conclusion that this case is saved from dismissal on mootness grounds because of the claim for money damages. That can be seen by considering what is all but certain to follow once we dismiss the appeal and vacate the decision and orders from which E-Z Eating and E-Z 47 appeal so that they can amend their complaints to add claims for money damages.[3] The owners undoubtedly will move to dismiss the amended complaint and the aggrieved parties, whoever they will be, then will take an appeal to this Court. Another panel of this Court will read the briefs and the relevant portions of the record and hear oral argument; the time the

---

3. Because Supreme Court dismissed the complaints on the merits, the majority correctly vacates the orders (see e.g. *Alvarez v Smith*, 558 US —, —, 130 S Ct 576, 581 [2009]). Although I would go further and vacate the decision underlying the orders, I note that the law of the case doctrine is not an inflexible one (*Metropolitan Package Store Assn. v Koch*, 89 AD2d 317, 321-322 [1982], *appeal dismissed* 58 NY2d 1112 [1983]), and thus Supreme Court will not be obligated to come to the same conclusion regarding the terms of the lease. Of course, if an amended complaint seeking money damages is not filed by E-Z Eating or E-Z 47, Supreme Court should dismiss the applicable action as moot.

members of this panel devoted to the record, the briefs and the parties' arguments will be for nought.[4]

## II

Turning to the merits, I think Supreme Court erred in holding that the relevant provisions of the lease unambiguously support the owners' position. Unquestionably, viewed in isolation, subparagraph (a) of paragraph 41 is unambiguous in permitting the tenant to "operate its business in the Demised Premises during the Term and occupy the Demised Premises solely as a restaurant with table-seating operated under the name and style of 'Burger King' for on and off site consumption of food and beverage and for no other purpose." But just as unquestionably, viewed in isolation, subparagraph (b) of the same paragraph is unambiguous in permitting the tenant, more expansively, to "use, occupy, operate and maintain the Demised Premises through the Term as a restaurant with table-seating for on and off site consumption in a reputable manner and in a manner which shall not detract from the character, appearance or dignity of the Building." As is proper, the owners seek to reconcile the two subparagraphs, arguing that the former specifies what can be operated and the latter specifies how it shall be operated. But this interpretation of subparagraph (b) certainly is not commanded by the language of the subdivisions. Moreover, it renders portions of subparagraph (b)—the words "as a restaurant with table-seating for on or off site consumption"—surplusage, contrary to a basic precept of contract interpretation (*Two Guys from Harrison-N.Y. v S.F.R. Realty Assoc.*, 63 NY2d 396, 403 [1984]). To be sure, as the owners correctly argue, in the event of a conflict between two provisions, the specific should control over the general (*John Hancock Mut. Life Ins. Co. v Carolina Power & Light Co.*, 717 F2d 664, 670 [2d Cir 1983] [applying New York law]). But the applicability of this precept underscores that there is conflict between the two subdivisions.

If there were no other relevant provisions of the lease, I might agree with Supreme Court's and the owners' interpretation of the lease. But in determining whether contractual provisions are ambiguous, the entire contract must be considered (*Metropolitan Life Ins. Co. v Noble Lowndes Intl.*, 84 NY2d 430, 437 [1994]). There are other relevant provisions, including paragraph 12 of a "Supplemental Rider" to the lease. "In order to

---

4. I concede, however, that judicial resources will be conserved to the extent the panel members decide that they need only read my discussion of the merits.

determine the nature of the thing promised, recourse to the circumstances attending the execution of the writing may be had" (*Sun Oil Co. v Heller*, 248 NY 28, 31 [1928]). A significant attending circumstance revealed by paragraph 12 is that a franchise agreement between E-Z Eating and Burger King Corporation had not been executed at the time the lease was executed. Under the owners' interpretation of the lease, however, E-Z Eating would have been at the complete mercy of the then landlord in the event E-Z Eating had been unable to conclude a franchise agreement with Burger King (*see Noble Lowndes Intl.*, 84 NY2d at 438 ["(l)anguage in contracts placing one party at the mercy of the other is not favored by the courts" (internal quotation marks and citation omitted)]; *see also Fleischman v Furgueson*, 223 NY 235, 241 [1918] ["(a) court will endeavor to give the construction most equitable to both parties instead of the construction which will give one of them an unfair and unreasonable advantage over the other"]).

In addition, the owners' interpretation of the lease entails something that at least borders on the absurd: the notion that the then landlord, an entity with no economic interest in Burger King Corporation, considered that particular type of hamburger joint to be the sole restaurant that could be operated on the premises "in a reputable manner which [would] not detract from the character, appearance or dignity of the Building." Regardless of whether that notion is absurd (*see Matter of Lipper Holdings v Trident Holdings*, 1 AD3d 170, 171 [2003] ["(a) contract should not be interpreted to produce a result that is absurd"]), it is difficult to square this interpretation of the lease with the precept that contracts should be construed in a commercially reasonable manner (*see e.g. Elsky v Hearst Corp.*, 232 AD2d 310, 311 [1996]). As discussed below, moreover, there is yet another reason to conclude that subparagraph (a) is ambiguous.

The disputed assignment and subleasing provision of the lease, set forth in paragraph 3 of a supplemental rider to the lease, also is ambiguous. Paragraph 53 of the rider to the lease begins by prohibiting the tenant from assigning the lease or subleasing the premises without the prior written consent of the landlord. It immediately goes on to state that the landlord shall not unreasonably withhold its consent, "provided that . . . the proposed use of the premises shall be as a restaurant with table-seating for on and off-site consumption and for no other purpose and shall not violate the terms of this lease or of any applicable law." Paragraph 3 of the supplemental rider provides as follows: "Notwithstanding any provisions to the contrary

contained in this Lease, this Lease may be assigned, or the Premises may be sublet in whole or in part, without the consent of the Landlord, to any corporation or other entity into or with Tenant may be merged or consolidated or to any corporation or other entity which shall be an affiliate, subsidiary, parent or successor of the Tenant, or of a corporation or other entity into or with which Tenant may be merged or consolidated."[5]

Paragraph 3 is ambiguous because at least two reasonable interpretations of it are possible (see Chimart Assoc. v Paul, 66 NY2d 570, 573 [1986] [in determining whether contract is ambiguous, "(t)he initial question . . . is whether the agreement on its face is reasonably susceptible of more than one interpretation"]). One possible reading of it, the one Supreme Court adopted, is that E-Z Eating may assign or sublet to an affiliate without the landlord's consent only if the affiliate operates a restaurant in accordance with the terms of subparagraph (a) of paragraph 41, i.e., a Burger King on the premises. The other possible reading, the one Supreme Court rejected, is that E-Z Eating may assign or sublet without the landlord's consent only if the affiliate operates a restaurant in accordance with terms of subparagraph (b) of paragraph 41, i.e., a restaurant "with table-seating for on and off site consumption in a reputable manner and in a manner which shall not detract from the character, appearance or dignity of the Building." Neither reading is commanded by the text, as neither restriction is stated in paragraph 3.[6]

However, there is a text-based reason to reject the first interpretation of paragraph 3. Under it, paragraph 3 would not give E-Z Eating anything it does not already have in the event it merged or consolidated with or otherwise was succeeded by another entity. After all, paragraph 39 of the lease specifies that its "covenants, conditions and agreements . . . shall bind and inure to the benefit of Owner and Tenant and their respective heirs, distributees, executors, administrators, [and] successors" (emphasis added). In other words, without paragraph 3 any successor of E-Z Eating would have the right to operate a Burger King on the premises. Accordingly, this reading of paragraph 3

---

**5.** The term "affiliate" is broadly defined as "any corporation which, directly or indirectly, controls or is controlled by or is under common control by the principals of Tenant." The parties do not dispute that E-Z 47 is an affiliate of E-Z Eating.

**6.** A third interpretation of paragraph 3 is that it permits E-Z Eating to assign to or sublease with an affiliate without any use restrictions. But neither E-Z Eating nor E-Z 47 embraces this manifestly unreasonable interpretation of paragraph 3 and the owners vanquish a strawman by imputing it to them.

is at odds with the precept that each provision of a contract should be given meaning (*Ruttenberg v Davidge Data Sys. Corp.*, 215 AD2d 191, 196 [1995]). Relatedly, the requirement of landlord consent under paragraph 53 is insubstantial with respect to an assignment to or sublease with an affiliate of E-Z Eating solely for the purpose of operating a restaurant with table seating for on and off site consumption. Provided only that the restaurant would operate in a reputable manner without affecting adversely the "character, appearance or dignity" of a building that had been housing a Burger King, it is difficult if not impossible to understand how consent reasonably could be denied. In other words, the second interpretation of paragraph 3 does not entail a significant concession by the landlord.

In opposition to the second interpretation, the owners insist that a tenant cannot confer on an assignee or sublessee a right of use greater than the right it enjoys under the lease. But the force of this argument wholly depends on the premise that E-Z Eating must operate only a Burger King restaurant. If that premise is incorrect, the argument is irrelevant. Even assuming that the lease does require E-Z Eating to operate only a Burger King, the parties were free to agree to permit the tenant to assign or sublease to an affiliate for a broader purpose (*Miller v Continental Ins. Co.*, 40 NY2d 675, 679 [1976]). It is no doubt very unusual and perhaps exceedingly rare for the parties to a lease to have a reason to permit the tenant to confer by assignment or sublease a right it does not enjoy under the lease. But a reason certainly can exist and the law certainly does not prevent such an assignment or sublease.

The ambiguous character of paragraph 3 provides another reason to conclude that subparagraph (a) of paragraph 41 does not unambiguously trump subparagraph (b). If, as I submit is plain, paragraph 3 reasonably can be read to permit E-Z Eating to assign or sublease to an affiliate for the purposes of operating a restaurant with table seating for on and off site consumption (in, of course, a "reputable" manner), it becomes all the more reasonable to construe paragraph 41 to permit E-Z Eating itself so to use the premises. To construe paragraph 41 otherwise would be to read the lease to prohibit E-Z Eating from doing directly what the lease freely permits it to do indirectly. That makes no sense.

For these reasons, Supreme Court erred in holding that the relevant lease provisions unambiguously support the owners' position. Accordingly, the complaints should be reinstated and the lease should be interpreted in light of the extrinsic evidence

offered by E-Z Eating and E-Z 47 concerning the negotiations over the lease with the then landlord. The gist of that evidence is that the language of subparagraph (a) was nothing more than a sop for Burger King (which required E-Z Eating and its principals to operate a restaurant in the name and style of Burger King as long as they were franchisees) and was included in the use provisions of paragraph 41 at its request, and for its rather than the owners' benefit. On this record we cannot tell whether the owners are in a position to counter that evidence, but of course any competent extrinsic evidence they may offer also is admissible. **[Prior Case History: 23 Misc 3d 1125(A), 2009 NY Slip Op 50936(U).]**